UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LEE GRENIER; TAVORUS FLUKER; | : | |
| ANTHONY ROGERS; THOMAS MARRA; | : | |
| LAWRENCE TOWNSEND; TERRENCE | : | |
| EASTON; LAMONT SAMUEL; | : | |
| IAN COOKE; and J. MICHAEL FARREN | : | |
| on behalf of themselves and all others | : | |
| similarly situated, | : | **CIVIL ACTION** |
| _Plaintiffs_ | : | **CLASS ACTION** |
| | : | |
| v. | : | |
| | : | |
| SCOTT SEMPLE, Commissioner of | : | |
| Correction; JAMES DZURENDA, | : | |
| former Commissioner of Corrections; | : | |
| LEO ARNONE, former Commissioner of | : | |
| Correction; THERESA LANTZ, former | : | |
| Commissioner of Correction; JAMES | : | |
| ARMSTRONG, former Commissioner of | : | |
| Correction; LAWRENCE MEACHUM, former | : | |
| Commissioner of Correction; HENRY | : | |
| FALCONE, Warden, Garner Correctional | : | |
| Institution; STEVEN LINK, Director, | : | |
| Department of Correction Engineering and | : | |
| Facilities Management; DAVID BATTEN, | : | |
| former Director, Department of Correction | : | |
| Engineering and Facilities Management, | : | |
| in their individual and official capacities, | : | |
| and John Does 1-3 | : | |
| _Defendants_ | : | August 26, 2016 |

**CLASS ACTION COMPLAINT**

**Introduction**

1.      This is a class action filed on behalf of all inmates, whether post-conviction or pre-trial

detainees, exposed to levels of indoor radon gas far in excess of EPA, OSHA and WHO

standards, while incarcerated at the Garner Correctional Institution, Newtown,

1

Connecticut Department of Correction. Forcing inmates to be exposed to indoor radon gas, a recognized human carcinogen far in excess of any published safe level for more than 20 years, constitutes deliberate indifference by correctional officials to conditions of confinement posing an unreasonable risk of serious damage to an inmate's health in violation of their rights under the United States and Connecticut constitutions.

2.  When radon gas is inhaled, densely ionizing alpha particles emitted by deposited short-lived decay products of radon (218Po and 214Po) can interact with biological tissue in the lungs leading to DNA damage. Cancer is generally thought to require the occurrence of at least one mutation, and proliferation of intermediate cells that have sustained some degree of DNA damage can greatly increase the pool of cells available for the development of cancer.

3.  In *Helling v. McKinney*, the Supreme Court held that the Eighth Amendment protects prisoners from an official's deliberate indifference to conditions posing an unreasonable risk of serious damage to the prisoner's future health. 509 U.S. 25, 33-35 (1993). At issue in *Helling* was an inmate's exposure to environmental tobacco smoke in the absence of a present physical injury. The Supreme Court held an inmate must show he was "exposed to unreasonably high levels" of environmental toxins. Id. at 35. To violate the Eighth Amendment, the inmate must show the risk he complains of is one that "society considers . . . so grave that it violates contemporary standards of decency to expose anyone unwillingly to such risk." *Helling*, 509 U.S. at 36. ("In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.").

2

4.     Indoor exposure to radon is recognized as the leading cause of lung cancer among non-smokers followed by exposure to environmental tobacco smoke (ETS) and exposure to radon after any history of smoking causes an exponential risk of developing lung cancer.

5.     Connecticut Department of Corrections permitted its employees at Garner to file a workers' compensation claim for exposure to high levels of indoor radon gas, without any limitations on length of exposure, thus accepting liability to its employees for the health risks imposed by a third of the daily indoor radon exposure over a five day work week as compared to inmates housed residentially at this facility 24 hours a day, 7 days a week.

6.     Plaintiffs seek declaratory and compensatory relief.

## Jurisdiction and Venue

This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. §§ 1983 and 1988, as well as the Eighth Amendment and Fourteenth Amendments to the United States Constitution. The Court has supplemental jurisdiction under the state law claims pursuant to 28 U.S.C. § 1367a.

Venue in this Court is proper pursuant to 28 U.S.C. § 1391.  This Court is authorized to grant declaratory relief under 288 U.S.C. § 2201 and 2202.

## Parties

Plaintiffs are all inmates exposed to indoor radon gas while incarcerated at the Garner Correctional Institution, Connecticut Department of Correction. and who were thus subject to conditions of confinement that violated their rights under the U.S. Constitution as well as the Connecticut Constitution.

Plaintiff  Lee Grenier was incarcerated at Garner Correctional Institution(hereinafter Garner")  beginning in 2008 for approximately four and one half years; he is presently incarcerated in a different state correctional facility .

Plaintiff Tavorus Fluker has been incarcerated at Garner since 2008.

Plaintiff Anthony Rogers has been incarcerated at Garner since at least 2011.

Plaintiff Thomas Marra, who suffers from terminal lung cancer, has been incarcerated at Garner since the mid-1990's.

Plaintiff Lawrence Townsend has been incarcerated at Garner since 2010.

Plaintiff  Terrence Easton has been incarcerated at Garner since 1998.

Plaintiff Lamont Samuel has been incarcerated at Garner since 2011.

Plaintiff J. Michael Farren was incarcerated at Garner since 2010.

Defendant Scott Semple has served as the Commissioner of Connecticut's Department of Correction since August 2014; from mid 2009 through November 26, 2013, defendant Semple was Warden at Garner Correctional Institution after which time he was promoted to Deputy Commissioner for Operations prior to being named to head the Department of Correction.

Defendant James Dzurenda served as Warden at Garner from 2005 to 2009, was Deputy Commissioner for Operations from July 2010 to April of 2013 when he became Commissioner of Connecticut's Department of Correction through August 2014.

Defendant Leo Arnone was the Commissioner of Connecticut's Department of Correction from 2010 to 2013.

4

Defendant Theresa Lantz was the Commissioner of Connecticut's Department of Corrections from 2003 to 2009.

Defendant James Armstrong was the Commissioner of Connecticut's Department of Corrections from 1995 to 2003.

Defendant Lawrence Meachum was the Commissioner of Connecticut's Department of Correction from 1987 to 1995.

Defendant John Does 1-3 were in charge of the construction project of Garner and the engineering and building safety since its construction.

Defendant Steven Link was the director of the Department of Correction Engineering andFacilities Management;

Defendants DAVID BATTEN was the former Director, Department of Correction : Engineering and Facilities Management.

Connecticut's Department of Correction is administered by the Commissioner of Correction and according to his job description shall be responsible for the overall management and direction of the Department and shall ensure that the Department's statutory duties are carried out.

Defendant Henry Falcone has been the Warden at Garner since March 7, 2014; Defendant Falcone became a captain when he was first assigned to Garner in 2006; he thereafter was promoted to Deputy Warden at Garner in 2011.

In accordance with Connecticut Department of Correction policy, while Wardens at Garner, Defendants Semple, Dzurenda and Falcone were responsible for the operations of that facility on a 24-hour basis, seven (7) days a week.

5

Defendant Steven Link is the Director, Department of Correction Engineering and Facilities Management for the Connecticut Department of Correction.  **(need actual dates)**

The Department of Correction Engineering and Facilities Management is responsible to provide centralized direction and technical assistance throughout the agency to include: management of the capital budget and plan; project design, approval and management; facility preventative maintenance; and repair. In addition, this unit also coordinates compliance with OSHA standards and environmental guidelines.

Defendant David Batten was the former Director, Department of Corrections Engineering and Facilities Management during times that the inmates were exposed to radon.

**If others in this position before Batten from construction Garner -- should be included with dates.**

At all relevant times herein, Defendants were acting in the performance of their duties and within the scope of their employment by Connecticut Department of Correction, and under color of state law.

**Class Action Allegations**

Plaintiffs bring this action on behalf of themselves and all others similarly situated, for the purpose of asserting the claims alleged in this Complaint on a common basis.

Plaintiffs seek to represent a class of all inmates, both post-conviction and pre-trial detainees, housed at Garner Correctional Institution in response to the December 2013 and January 2014 testing results for indoor radon gas that revealed levels in excess of  the EPA action level of 4.0 pi C/L. The levels of radon found at the Garner Correctional facility were double,

6

triple, and even more than quadruple the safe level set by the EPA-meaning that inmates were daily exposed to the equivalent of smoking 3-9 packs of cigarettes a day.

A class action is a superior means, and the only practicable means, by which Plaintiffs and unknown Class members can challenge that exposure to indoor radon gas, a known carcinogen, subjected them to conditions of confinement that violated their rights under the U.S. Constitution as well as the Connecticut Constitution.

This action is brought and may properly be maintained as a Class action pursuant to Rule 23(a)(1)-(4), Rule 23(b)(2), and Rule 23(b)(3) of the Federal Rules of Civil Procedure.

This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

Plaintiffs propose two Classes: a Declaratory Class and a Damages Class.

(A)    The Declaratory Class is defined as: all inmates, both post-conviction and pre-trial detainees, housed at Garner Correctional Institution at any time within the following parameter: from the date of its opening in November 1992 at least through the emergency installation of the radon mitigation system completed on October 10, 2014. This class may go beyond the installation of a remediation system as that remediation system was only placed in areas tested.

(B)    The Damages Class is defined as: all inmates, both post-conviction and pre-trial detainees, who have been exposed to levels of radon in excess of the EPA standard and who require periodic medical monitoring to determine the impact of the exposure and provide curative and palliative care; and  those already been diagnosed, or at such time in the future as they are diagnosed. At this time, those medical conditions include lung cancer and chronic,

7

nonmalignant lung diseases such as chronic obstructive pulmonary disease (COPD), emphysema, chronic interstitial pneumonia, pulmonary fibrosis.

## A.    Numerosity: Fed. R. Civ. P. 23(a)(1)

This class is so numerous that joinder of their claims is impractical.

The stated capacity at Garner, based on its design, is 520 inmates; at various times since its opening, when Connecticut has experienced an overall adult male inmate population in excess of the officially established capacities of its correctional facilities,  Garner has housed up to one hundred inmates over its capacity by utilizing its gymnasium as a dormitory.

In addition, the inmate population at Garner in any given year is not static, with inmates routinely being released or transferred to other correctional facilities.  The time parameters for this action run from November 1992 through October 2014, a period just shy of twenty two (22) years.  Class members number in the thousands.

## B.    Commonality: Fed. R. Civ. P. 23(a)(2)

The relief sought is common to all members of the Class, and common questions of law and fact exist as to all members of the Class.  Concededly, post-conviction inmates contend that their conditions of confinement constituted cruel and unusual punishment under the Eight Amendment to the United States Constitution and Connecticut Constitution, Article First, Section ___ and pre-trial detainees contend a violation under the Fourteenth Amendment to the United States Constitution and Connecticut Constitution, Article First, Section ___of their right to be free from deprivations of liberty without due process of law.  As a matter of proof, however, the due process clause of the Fourteenth Amendment to the United States Constitution provides to pre-trial detainees at least equal protection to that accorded convicted prisoners under

8

the Eighth Amendment to the United States Constitution does not apply to pre-trial detainees.
The state constitutional claims follow these same parameters.

**C.     Typicality: Fed. R. Civ. P. 23(a)(3)**

The named Plaintiffs' claims are typical of the claims of the members of the Classes, and
they have the same interests as all other members of the Classes that they represent.  The answer
to whether the acts and omissions by Defendants are unconstitutional as a matter of federal and
state law will determine the claims of the named Plaintiffs and every other Class member.

**D.     Adequacy: Fed. R. Civ. P. 23(a)(4)**

Plaintiffs are adequate class representatives because all of members of the Declaratory
Class and some, because of a confirmed medical diagnosis causally related to radon exposure,
are members of the Damages Class; their interests coincide with, and are not antagonistic to,
those of the Classes. There are no known conflicts of interest among Class members, all of
whom have a similar interest in vindicating their constitutionally protected rights.

Additionally, Plaintiffs will be adequate representatives of the class, in that they are
represented by competent and skilled counsel whose interests are fully aligned with the interests
of the Classes.

**E.     Fed. R. Civ. P. 23(b)(2)**

When radon gas is inhaled, densely ionizing alpha particles emitted by deposited short-
lived decay products of radon can interact with biological tissue in the lungs leading to DNA
damage.

Class action status is appropriate because a declaration that Defendants' deliberate
indifference to conditions imposing an unreasonable risk of serious damage to inmates housed at

9

Garner through exposure to radon, established, prior to Garner's construction, as a human carcinogen by the International Agency for Research on Cancer in 1988 and added by Congress that same year to the Toxic Substances Control Act. The fact that radon exposure has been determined to be "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such risk," *Helling v. McKinney*, 509 U.S. 25 (1993) the same fact basis will apply to each Class member.

**F:      Fed. R. Civ. P. 23(b)(3)**

Class treatment under Rule 23(b)(3) is also appropriate because the common questions of law and fact overwhelmingly predominate.

The common questions of law and fact are dispositive questions in the case of every member of the Class. The question of liability can therefore be determined on a class-wide basis. Class-wide treatment of liability is a far superior method than individual suits by hundreds or thousands of individuals exposed to radon while incarcerated at Garner.

The question of damages will also be driven by class-wide determinations. To the extent that individual damages will vary, they can be categorized into subgroups based on a confirmed medical diagnosis: (1)lung cancer; (2) chronic, nonmalignant pulmonary diseases; (3) any medical condition conclusively identified in future as causally related to radon exposure and 4) any prisoner who spent time at Garner prior to remediation and now needs medical monitoring to determine if their lungs have been impacted and periodically to treat any developing radon caused conditions quickly. Determining damages for individual Class members can thus typically be handled in a ministerial fashion based on easily verifiable medical records. If need be, individual hearings on Class-member specific damages can be held after Class-wide liability is

10

determined—a method far more efficient than the wholesale litigation of hundreds or thousands of individual lawsuits.

## Exhaustion of Administrative Remedies

At no time did Defendants Semple, Dzurenda and Falcone provide plaintiffs, or any member of the plaintiff class, with notice of the test results from December 2013 and January 2014 that revealed high levels of indoor radon gas, even though plaintiffs, with one exception, were confined at Garner during the periods of radon testing.

At no time did Defendants Semple, Dzurenda and Falcone provide plaintiffs, or any member of the plaintiff class, with the  information provided thereafter to Garner's correction officers, administrative staff and medical unit: (1) that the radon testing results necessitated an emergency capital expenditure for the installation of a radon mitigation system; (2) information on the risks associated with indoor radon exposure and the determination that quarantining the medical block was not mandated even though the radon results in various rooms were the equivalent of being exposure to more than two to eight  packs of cigarette smoke per day; and 3) written documentation that a mass filing of workers' compensation claims for all Garner correctional staff and medical care unit was under consideration by the carrier.

By intentionally and willfully depriving the plaintiffs and members of the plaintiff class of notice as to the indoor radon testing results and installation thereafter of a radon mitigation system, Defendants Semple, Dzurenda and Falcone deprived plaintiffs and members of the

plaintiff class of the opportunity to file a timely grievance and thereafter exhaust their

administrative remedies.

The Policy set forth in Connecticut Department of Correction Administrative Directive

9.6, entitled Inmate Administrative Remedies, effective as of August 15, 2013, states at

Paragraph (1) : "The Department of Correction shall provide a means for an inmate to seek

formal review of an issue relating to any aspect of an inmate's confinement that is subject to the

Commissioner's Authority.  The Inmate Administrative Remedies Process enables the

Department to identify individual and systemic problems, to resolve legitimate complaints in a

timely manner and to facilitate the accomplishment of its mission."

By intentionally and willfully depriving the plaintiffs and members of the plaintiff class

of notice as to the indoor radon testing results and installation thereafter of a radon mitigation

system as well as the significant health risks associated with exposure to this known human

carcinogen, Defendants Semple, Dzurenda and Falcone exhibited a bias at the highest

administrative levels of both Garner Correctional Institution and the Department of Correction

against plaintiffs and members of the plaintiff class as to the issue of inmate exposure to indoor

radon gas.

 Said demonstrable bias by Defendants Semple, Dzurenda and Falcone violated the stated

policy of the Inmate Administrative Procedures, thus rendering the inmate grievance procedures

inadequate both as a matter of fact and law such that each plaintiff's individual failure to exhaust

his administrative remedies is excusable.

Defendants Semple, Dzurenda and Falcone's acts and omissions, intentionally and

willfully depriving the plaintiffs and members of the plaintiff class of notice as to the indoor

12

radon testing results and installation thereafter of a radon mitigation system and the significant health risks from exposure to this known carcinogen, constituted a predetermination of the outcome of any inmate grievance on radon, rendering the inmate grievance procedures futile as a matter of law and fact. Furthermore, damage done by the excessive levels of radon is now concluded, and there is nothing correctional staff can now do to remediate the problem. The issue is now compensation which the correctional department cannot do and is not authorized to do.

**Statement of Facts**

**Radon: a known human carcinogen**

Radon is radioactive gas that comes from the natural decay of uranium that is found in nearly all soils as well as rock and water.

Because radon is a noble gas, it is tasteless, odorless, colorless and imperceptible to the senses.

In sharp contrast to an inmate's active and conscious perception of exposure to the toxicity of environmental tobacco smoke (ETS or second hand smoke) through his visual and olfactory senses, plaintiffs and members of the plaintiff class could not personally confirm their exposure to radon by virtue of their incarceration at Garner, with its closed ventilation system that trapped any radon leaked from the soil inside.

Plaintiffs and members of the plaintiff class were entirely dependent on Defendants affirmatively to disclose that inmates at Garner experienced indoor radon exposure on a daily basis over prolonged periods of time, except for that limited time during which they were permitted outdoors for recreation or other authorized purpose.

13

Radon is a source of ionizing radiation and a proven carcinogen; radon is the leading environmental cause of cancer mortality in the United States.

Soil gas infiltration is recognized as the most important source of residential radon; the primary health risk of radon in well water is from the inhalation of radon released indoors.

Once radon has diffused into a building, further disintegration produces radon progeny (daughters) that tend to be electronically charged and tend to attract to dust particles that are thereafter inhaled into the lungs where they further decay. Radon progeny are the major source of human exposure to alpha radiation that may directly or indirectly damage DNA and other cell components, resulting in radon-induced lung diseases or cancer.

Alpha particles, which can only penetrate a short distance into bronchial epithelium, induce more biological damage than beta or gamma radiation, and can induce DNA base mutations and chromosomal strand breaks.

The substantive health risks associated with indoor radon exposure are underscored by the fact that in 1988, when the Connecticut Department of Correction, under the leadership of Defendant Meachum were in the planning phases of constructing Garner, Congress added Title III on Indoor Radon Abatement to the Toxic Substances Control Act.

That same year, in which Garner was still in the planning phases, the Surgeon General of the United States warned that radon is the second leading cause of lung cancer in the United States and the leading cause of lung cancer in individuals who never smoked.

According to the World Health Organization, lung cancer risk rises sixteen percent (16%) with every 2.7 pCi/L increase in radon exposure.

14

All major U.S. health organizations, such as the Centers for Disease Control and Prevention, the American Lung Association and the American Medical Association, concur with estimates that radon causes thousands of preventable lung cancer deaths each year.

The absolute numbers of radon- induced lung cancers are much larger in people who smoke or who have smoked in the past, due to a synergistic effect between radon and smoking.

In January 2005, the Surgeon General, after reaffirming early warnings that breathing indoor radon gas over prolonged periods presents a significant health risk, noted in a public release that "It's important to know that **this threat is completely preventable**. Radon can be detected with a simple test and fixed through well-established venting techniques." (Emphasis supplied).

**Garner Correctional Institution**

After Congress added radon to the list of  toxic substances in 1988, the public policy concerns that caused the U.S. Environmental Protection Agency and other local and state public health organizations and nonprofits to advocate testing for radon gas in the home grew from an acknowledgement that individuals spent the most time indoors (70%) in their residential setting.

For inmates of a correctional facility, such as the plaintiffs here and those similarly situated, Garner Correctional Institution is their home; their residential setting 100% of the time.

In 1988, when Congress added radon to the list of toxic substances, Connecticut Department of Correction, under the leadership of Defendant, announced that it planned to build a 400-bed jail on the 700-acre grounds of the state-owned Fairfield Hills psychiatric hospital, south of the center of Newtown, despite active town opposition.

15

Garner Correctional Institution, a level 4 high security facility, is located at 50 Nunnawauk Road in Newtown, Connecticut, that houses adult males; it opened on opened on November 17, 1992.

Defendant Meachum, after consideration of the input provided by the then Director, Department of Engineering and Facilities Management, decided to construct Garner Correctional Institution on land that had once been a state mental health facility located at Fairfield Hills Hospital in Newtown, Connecticut.

According to the federal Environmental Protection Agency and the U.S. Geological Survey, which evaluated the radon potential in the United States and developed a Map of  Radon Zones to assist national, state and local organizations and building code officials in deciding whether radon-resistant features should be applicable to new construction, Newtown, Connecticut is located in Zone 1 – Highest Potential (greater than 4.0 pCi/L),which designation reflects the average short-term radon measurement in a building without implementation of radon remediation control methods.

Defendant Meachum, on behalf of the Connecticut Department of Corrections, thus decided to construct Garner in an area where indoor radon levels would likely exceed the EPA action level of 4.0 pCi/L if no radon mitigation system were implemented.

Radon resistant construction techniques are effective in preventing or minimizing radon entry.

In the late 1980's and early 1990's, the Environmental Protection Agency's Office of Research and Development promulgated recommendations for radon prevention in the design and construction of schools and other large buildings.  Because it is easier and much less

16

expensive to design and construct a new building with radon-resistant and/or easy to mitigate features than to add these features after a building has been completed and occupied, EPA recommended that architects and engineers should use of combination of radon construction prevention techniques when building in an area identified as having the potential for high radon levels such as Newtown, Connecticut where the Department of Corrections built Garner Correctional Institution.

Under a 1990 law approved overwhelmingly by the Connecticut General Assembly after a top public health official testified that radon was one of the "most significant environmental hazards today, which went into effect on January 1, 1991 well in advance of Garner's construction, the Department of Public Health was tasked with establishing acceptable limits for radon in the air and drinking water in schools and for public drinking water.

Because the Engineering and Facilities Management division of the Department of Corrections is tasked with the centralized direction and technical assistance, among other responsibilities, for project design, approval and management as well as charged with coordinating compliance with OSHA standards and environmental guidelines, that department should have recommended to Defendant Meachum that the construction plans for Garner include a radon mitigation system.

Given the substantive health risks associated indoor radon exposure in 1988 made more manifest by Defendant Meachum's decision to construct Garner on a site identified as posing the highest risk for radon above the EPA action level of 4.0 piC/L, Defendant Meachum's decision, as the Department of Correction's ultimate authority, to construct Garner without any

17

preventative radon mitigation system ensured that inmates housed at Garner would be intentionally exposed to a known carcinogen, with no known threshold of exposure.

By failing to conduct indoor radon testing as is recommended after the completion of construction before Garner opened its doors to house inmates in November 1992, Defendant Meachum missed another opportunity to install a radon mitigation that would have prevented inmate exposure to the health risks associated with indoor radon.

Higher radon levels are usually observed during the winter months when buildings are sealed; because Garner Correctional Institution is a closed ventilation system there was no capacity to open windows to mitigate indoor radon levels.

During each of their respective tenures, Defendants were afforded various opportunities to test for indoor radon at Garner and consequently to mitigate its harmful effects for inmates and staff alike, triggered by the adoption of state/federal laws and/or regulations relating to radon toxicity or highly publicized environmental concerns for high radon and/or uranium levels in the water drawn from the underground aquifer from which Garner obtained its water supply water. On each such occasion, Defendants failed to test for indoor radon at Garner, thus missing earlier opportunities to mitigate this preventable health risk for inmates and staff alike many years before the ultimate installation of a radon mitigation system in October 2014.

Public Act 95-311, later codified as Connecticut General Statutes § 20-327b, which went in to effect on January 1, 1996, provided that residential property sellers must provide a written residential condition report to a prospective buyer, which disclosure form adopted through regulations requires sellers to disclose any radon testing results.

Because Garner is the residential setting for its inmates, the public policy underlying Connecticut General Statutes § 20-327b provided such trigger which Defendants Meachum, Armstrong, and Druzenda, in his then capacity as Warden at Garner, ignored to the detriment of the members of the plaintiff class.

In the fall of 1996, the Department of Public Health's survey testing of well water across Connecticut, including the Middle Gate School in Newtown, revealed high levels of radon in the water.  Because the Commissioner of the Department of Public Health initially refused to disclose the locations, despite an opinion from then State Attorney General Richard Blumenthal that the names of the towns, schools and utilities could be released so the public would learn of the problem, these high radon levels and the risks health risks presented was widely publicized.

Defendant Armstrong ignored such triggering event and failed to test for indoor radon at Garner in 1996 to the detriment of the members of the plaintiff class.

As of October 1997, the federal Environmental Protection Agency's Office of Indoor Air and Radiation had issued a publication entitled "An Office Building Occupant's Guide to Indoor Air Quality" that was intended, among other things, to encourage those in facilities management, such as Defendants Link and Batten, to develop preventive indoor air quality management programs following guidance from EPA and the National Institute for Occupational Safety and Health (NIOSH).

Given that such indoor air quality management programs were intended to address conditions faced by those occupants that spend extended time indoors such as a full workday, defendants should have been cognizant that these same principles applied to inmates housed at

19

Garner in a closed indoor ventilation system for up to 24 hours per day, seven days per week, many of whom resided in these conditions for many months or years.

Had the defendants Link and Batten applied such guidelines to the issue of the indoor air quality at Garner, the high levels of radon could have been detected many years earlier and exposure to such high levels of radon posing significant health risks would have been avoided for staff and inmates alike.

Correctional and medical staff (first DOC employees and later designated employees of the University of Connecticut Health Center Correctional Managed Care (CMHC)) who worked in the medical, mental health and dental areas at Garner Correctional Institution that are below ground level regularly and routinely throughout the years beginning shortly after Garner opened complained about the indoor air quality, including issues of mold, water and mildew. Had defendants Link and Batten or their predecessors properly and thoroughly investigated such complaints over the years in accordance with recommended EPA and NIOSH guidelines, the high levels of radon that posed significant health risks to staff and inmates alike would have been detected and mitigated years earlier.

In November 2000, Newtown public officials had the drinking water at its town schools tested for the presence of uranium.  In late January, 2001, the test results for Middle Gate School were publically released, revealing an elevated level of uranium in the school's drinking water of 211 pCi/L, approximately eight times greater than the EPA guideline of 27 pCi/L for allowable uranium in drinking water.  Middle Gate School thereafter made bottled water available as its sole drinking source.

20

Notably, Middle Gate School is the only town school at those times to share its water supply with Garner Correctional Institution.  In its January 2003 update to its Community Facilities Plan of Conservation and Development (Plan Memorandum #10), Newtown was to improve the Middle Gate School by connecting it to the United Water Connecticut's water system so it was no longer dependent upon the well system it had previously shared with Garner Correctional Institution which tested high for radon and uranium in the drinking water.

 Defendants Armstrong again ignored such triggering events and failed to test for indoor radon at Garner in from November 2000 to January 2003 to the detriment of the members of the plaintiff class.

At the direction of Defendant Batten, DOC Director of Engineering and Facilities, an informational column published in the September 10-23, 2006 issue of the Department of Correction's periodic newsletter P.R.I.D.E. at Work discussed indoor radon gas, including its identification as the second leading cause of lung cancer in the United States, the significant health risk imposed by breathing it over prolonged period.

Although Defendant Batten recognized that radon can enter through the cracks in the foundation or through well water, thereafter trapping this hazardous gas inside dwellings, he failed to ensure during his tenure as Correction's Director of Engineering and Facilities that indoor radon testing occurred at Garner, which houses inmates within a closed ventilation system in an area identified by the EPA as having high concentrations of radon gas.

The high levels of radon found at Garner as a result of testing first in December 2013 and thereafter in January 2014 were thus entirely preventable; and would have been prevented years earlier but for the acts and omissions of the Defendants.

21

**Impact of the presence of a school at Garner**

Radon testing of Garner's school classrooms in December 2013 was federally mandated; had such federal mandate not been imposed at that time, no radon testing at Garner would have occurred and it is highly probable the inmates would continue to be exposed to the harmful effects of radon to this date.

As early as 1971, under the leadership of Commissioner John Manson (1971-1983), Connecticut Department of Correction became the second in the country to organize the educational system into a unified school district, designated by the state as Unified School District #1.

Garner's educational offerings include completion of a high school diploma and special education services for those inmates entitled by law to a public education through their twenty-first birthday under the Individuals with Disabilities Education Act (IDEA).

The Student and Parent/Guardian Handbook of Unified School District # 1, Connecticut Department of Corrections provides notice under the heading "Asbestos" that "[l]egislation requires all school buildings to be reevaluated to determine if asbestos is present and if it poses a significant health hazard to the building's occupants. The Department of Correction meets or exceeds these OSHA standards."

Connecticut General Statutes § 19a-333 entitled "Regulations re asbestos-containing materials in schools" provides in relevant part that "[t]he Department of Public Health shall adopt regulations in accordance with the provisions of chapter 54 which shall meet or exceed the requirements mandated by the United States Environmental Protection Agency standard for

22

asbestos-containing materials in schools in accordance with federal regulations as from time to time amended."

Although the presence of a school on site required to educate inmates eligible under the IDEA at Garner should have also triggered the legal obligations established for radon in schools, just as Unified District # 1 complied with legal directives on asbestos, Defendants failed to comply with these state dictates.

Connecticut General Statutes § 19a-37b, which went into effect in 1990 prior to Garner's construction, required the state Department of Public Health to adopt regulations to establish radon measurement requirements and procedures to reduce elevated radon levels in public schools.

Connecticut General Statutes § 10-203, since its amendment in 1996, has required each local and regional board of education to maintain its facilities in accordance with applicable public health statutes and regulations.

Since 2003, Connecticut has required indoor air quality testing in its public schools using EPA protocols that include testing for radon pursuant to Connecticut General Statutes § 10-220 (d) (2).

Pursuant to General Statutes § 10-220 (d) (7) and (14),  Connecticut has also required since 2003 making radon test results and plans for mitigation available for public inspection, including on Board's or school's website.

Since 2003, Connecticut General Statutes § 10-291 provides that the state Department of Education cannot approve a school building project or plan located in EPA Zone 1, the same EPA

designated zone in which Garner was constructed, unless project plan incorporates techniques to mitigate radon levels in air of facility.

The passage in 2003 of this comprehensive state legislative structure to address the substantive health risks of radon to children attending school again provided, at a minimum, a triggering event such that Defendants Lantz and Batten should have tested for radon in Garner's classrooms.

On June 30, 2003, Defendant Lantz publicized its fiscal stewardship as an agency accomplishment when it returned $9,333,754 to the Connecticut's General Fund at the conclusion of  fiscal year 2002-2003, highlighting that the Department is especially proud of its prudent fiscal management at a time when state government overall is battling ever tightening budgetary constraints.  Had indoor radon testing been conducted at Garner in 2003, the cost of installing a mitigation system preventing any future harmful radon exposure would likely have been significantly less than the $60,000 paid in 2014.

Ongoing compliance with these directives on indoor radon at schools would have alerted Defendants Semple, Dzurenda, Arnone, Falcone and Link of the need to test for radon in Garner's classrooms, the very testing location in December 2013 that revealed indoor radon levels in excess of EPA's action level of 4.0 piC/L.

By first failing to include a radon mitigation in Garner's design, and thereafter failing to test for indoor radon, despite numerous legislative prompts and environmental events in Newtown revealing high levels of radon and uranium in the underground water supply shared with Garner that should triggered indoor radon testing over the years, the acts and omissions of

24

Defendants constitution deliberate indifference to the conditions of confinement to which plaintiffs, and those similarly situated, were subjected.

Defendants knew that inmates housed at Garner from its inception until the installation of the radon mitigation system in October 2014 faced substantial risk of serious harm from indoor radon exposure, and disregarded that risk by failing to take reasonable measures to abate it.

Although one plaintiff has a confirmed diagnosis of lung cancer, future risk can suffice to constitute a substantial risk of serious harm, even if an inmate experiences no present symptoms. And there are a number of former employees who suffer from lung cancer and lung disease.

The World Health Organization has urged that countries adopt an action level of 2.7 pCi/L because 4.0 pCi/L is the equivalent of smoking 8 cigarettes a day; exposure to indoor radon at 10.0 pCi/L is equivalent to smoking more than 2 packs of cigarettes a day; and exposure to indoor radon at 20.0 pCi/L is equivalent to smoking more than 4 packs of cigarettes day

**Radon testing results**

Indoor radon exposure at Garner depending on location (and housing units were not tested) equates to smoking from ten (10 )cigarettes a day (5.0 pCi/L) to more than four packs packs of cigarettes a day (23.7 pCi/L).

When federal mandated testing of Garner's frequently occupied school rooms was conducted in December 2013, the Connecticut Department of Public Health, Environmental Health Section - Radon Program distributed a letter for notification purposes of the radon testing event to all Garner staff (both DOC and CMHC).  No inmates at Garner were ever informed that radon in air testing was being conducted.

Defendants Semple, Dzurenda, Falcone and Link made a deliberate and conscious choice, after having been informed of the need for follow-up testing over and expanded area beyond the classrooms at Garner initially tested, that the cell blocks housing inmates would not be tested because pursuant to Connecticut Department of Public Health, Environmental Health Section - Radon Program protocol, inmates would have to be notified in writing of the radon testing event.

On January 27, 2014, Allison Perry Sullivan, an Environmental Analyst with the Connecticut Department of Public Health, Environmental Health Section - Radon Program, sent a detailed letter to Richard Pease, the Environmental Analyst for the Connecticut Department of Correction under its Division of Engineering and Facilities Management, setting forth the results from the radon in air testing performed at Garner, initially from December 11-17, 2013 and thereafter from January 13-16, 2014.

Although that January 27, 2014 letter closed with the state Department of Public Health's stated desire "to assist [DOC] in the radon testing efforts to promote a healthy environment for GCI **residents** and staff," (Emphasis supplied), Defendants Semple, Dzurenda and Falcone failed to inform inmates at Garner of the high levels of radon found,all of which exceeded the EPA action level and  many of which were multiples of the EPA action level of 4.0 piC/L, including some areas producing an average test result in excess of 20.0 piC/L.

As reported by Connecticut's Department of Correction in 2011, the overall cost per inmate for medical, mental health and dental services was $4,780; the per inmate health cost at Garner Correctional Institution was significantly higher, approximately $12,000.

The medical, mental health and dental sections of Garner had significantly higher radon levels than other sections tested that also demonstrated levels above the EPA action level of 4.0 pCi/L, many of which were several multiples of the EPA action level.

On March 13, 2014, Defendant Falcone thereafter informed DOC staff, through Roll Call, (which Roll Call notice CMHC also utilized to inform Garner medical staff) of the elevated indoor radon testing results, necessitating remediation.

Although Defendants Semple, Dzurenda and Falcone considered it necessary to inform DOC staff on March 13, 2014, they intentionally, willfully and recklessly failed to inform inmates residing at Garner or who had previously resided at Garner of this "emergency" situation, whom, by definition of their 24/7 incarceration, had significantly longer exposure to the high radon levels than any DOC staff member.

Although as of March 13, 2014, Defendants Semple, Dzurenda and Falcone had made the complete report of radon testing results available in the Human Resources Office for review by DOC staff, they intentionally, willfully and recklessly failed to make such indoor radon testing report available to inmates residing at Garner, or to any inmate who had previously resided at Garner, despite Defendant Falcone's claim in the March 13, 2014 Roll Call notice that "[DOC] are committed to the health and safety of our inmates . . . ."

On March 14, 2014, Richard Bush, Health Services Administrator 2 of UCONN Health Corrections Managed Health Care Central Office, sent an email to CMHC employees at Garner, which in addition to attaching Defendant Falcone's March 13th Roll Call, stated, as part of the list of initiatives/actions that have been taken or are pending concerning the high levels of radon found at Garner, that "DOC staff are having their employees complete WC [Workers

27

Compensation] paperwork. I will be reviewing this with CMHC Central Office and HR. It's very likely that we will follow DOC's lead on this."

On March 21, 2014, Richard Bush sent an email to CHMC employees at Garner entitled "Radon Update –WC claims;" that email stated, after speaking with the Department of Administrative Services representative who is coordinating the best way to file the claims for both DOC and CMHC, "**[t]hey are looking at creating a mechanism with the WC carrier to mass file the WC 207 Forms for both Agencies.**"   (Emphasis supplied).

On May 2, 2014, in a message to Roll Call at Garner – Deputy Warden Denise Dilworth informed DOC staff that Defendant Link "has received the draft remediation design for Garner and [is] reviewing it and corresponding with the consultant with comments/questions. At this time it is not ready for bidding however they are working as fast as possible to bring it to that point. . . . They will expedite all phases as much as possible while making sure we get a good product/project."  This information however was not shared with Garner's inmates.

In its May 8, 2014 to June 13, 2014 issue of P.R.I.D.E. at Work, Defendants Semple, Falcone and Link disclosed to correctional employees the need for Radon Mitigation at Garner Correctional Institution, but failed to disclose such elevated indoor radon levels requiring remediation to inmates housed at Garner.

That newsletter issue further revealed to correctional employees, but not inmates housed at Garner, that a complete report of the radon testing results is available for review in Garner's Administrative Office (Room 104). At no time did Defendants Semple, Falcone and Link make such complete report available to inmates housed at Garner for their review.

That same newsletter further revealed to DOC employees, but not plaintiffs or those similarly situated, that is other inmates housed at Garner at that time or who had been incarcerated at Garner in the past but were now housed at a different DOC facility, that DOC employees had the ability to complete a WC 207 package in order to preserve their right to workers' compensation benefits in the future should they have or develop a medical condition linked to indoor radon exposure above the EPA action level of 4.0 pCi/L (picocuries per liter of air).

In permitting its employees to file a workers' compensation claim for exposure to high levels of indoor radon gas, without any limitations on length of exposure, Defendants Semple, Falcone and Link have established both as a matter of fact and law that a serious risk to health or future exists due to indoor radon exposure.

In its October 11, 2014 to November 21, 2014 issue of P.R.I.D.E. at Work, Defendants Semple, Falcone and Link disclosed the following: The need for the mitigation systems was discovered earlier this year when, after the completion of federally mandated radon testing of schools throughout the department, radon levels above the action level of 4 picocurie/ liter were found at Garner CI. Current Environmental Protection Agency guidelines suggest that action be taken if the radon level in any occupied part of a building reaches or exceeds 4 pCi/L. Radon is measured in picocuries per liter of air (pCi/L). To better understand the relative amounts to which a person may be exposed, the average indoor level is 1.3 pCi/L, and about 0.4 pCi/L is normally found in the outside air.

That same newsletter also disclosed that "[a]s a result of the testing, the Department of Correction (DoC) in conjunction with the Department of Public Health (DPH) initiated an **emergency** radon remediation project. An environmental consultant was hired to evaluate the

29

situation and develop an action plan. Two licensed radon remediation contractors with experience in large facility remediation were invited to design and bid on a system to lower the radon levels. The system designs were evaluated by an environmental consultant along with staff members from the DoC's Facilities Management and Engineering Unit. They settled on a design consisting of six Active Soil Depressurization System units." (Emphasis supplied).

Defendants Semple, Falcone and Link intentionally withheld such information from inmates housed at Garner.

Under state law, the Department of Correction is tasked with establishing a public safety committee in each municipality in which a correctional facility is located. The (DOC/Garner) Public Safety Committee meets quarterly to review correctional safety and security issues that affect Newtown.

The Public Safety Committee (DOC/Garner) Minutes on March 4, 2014 reveal in relevant part that defendant Warden Falcone informed Newtown public officials that "[t]he facility tested high for radon last year and again even higher this year. They will work toward rectifying this problem."

The Public Safety Committee (DOC/Garner) Minutes on December 2, 2014 reveal in relevant part that defendant Warden Falcone updated Newtown public officials  and others present on the radon mitigation system installed at Garner Correctional Institution and that further testing would take place when the ground freeze to ensure that indoor radon levels were safe.

Although defendant Warden Falcone considered it prudent to inform Newtown public officials and other members of the Public Safety Committee about testing results from December

30

2013 and January 2014 that revealed high levels of radon and the installation of the new radon mitigation system to alleviate this problem, at no time did defendant Warden Falcone inform those inmates incarcerated at Garner about the high levels of indoor radon found within its facility and the installation of a radon mitigation system to bring indoor radon levels under the EPA action level.

### Count I – Federal Constitutional Violations

Plaintiffs incorporate by reference Paragraphs 1 through  , as if more fully set forth herein.

For all named plaintiffs and class members housed at Garner Correctional Institution post-conviction, the practices, policies, acts and omissions alleged in this Complaint that exposed them to indoor radon gas are in violation of the Eighth Amendment to the United States Constitution in that they deprived them of their right to be free from cruel and unusual punishment.

Although the Eighth Amendment to the United States Constitution does not apply to pre-trial detainees, the due process clause of the Fourteenth Amendment to the United States Constitution provides to pre-trial detainees at least equal protection to that accorded convicted prisoners.

For those class members housed at Garner Correctional Institution as pre-trial detainees, the practices, policies, acts and omissions alleged in this Complaint that exposed them to indoor radon gas are in violation of the Fourteenth Amendment to the United States Constitution in that they deprived them of their right to be free from deprivations of liberty without due process of law.

Although the installation of the radon mitigation system at Garner Correctional Institution completed on October 10, 2014 corrected the unconstitutional conditions of confinement, the harms suffered by post-conviction plaintiffs and post-conviction members of the plaintiff class from their exposure to such unconstitutional conditions of confinement prior to that date caused irreparable physical harm.

Although the installation of the radon mitigation system at Garner Correctional Institution completed on October 10, 2014 corrected the due process violations, the harms suffered by pre-trial plaintiffs and pre-trial members of the plaintiff class from their exposure to such unconstitutional conditions of confinement prior to that date caused irreparable physical harm.

By virtue of their deliberate indifference to the serious health risks associated with indoor radon exposure, including their intentional refusal to provide medical monitoring and management to those post-conviction plaintiffs and class members who have not yet exhibited a medical condition associated with radon exposure, Defendants Semple, Dzurenda and Falcone, all of whom had actual knowledge of the December 2013 and January 2014 test results revealing high levels of indoor radon gas, violated the Eighth Amendment to the United States Constitution as determined under *Estelle v. Gamble*, 429 U.S. 97 (1976).

By virtue of their deliberate indifference to the serious health risks associated with indoor radon exposure, including their intentional refusal to provide medical monitoring and management to those pre-trial plaintiffs and class members who have not yet exhibited a medical condition associated with radon exposure, Defendants Semple, Dzurenda and Falcone, all of whom had actual knowledge of the December 2013 and January 2014 test results revealing high

levels of indoor radon gas, violated the Fourteenth Amendment to the United States Constitution by deprivation of liberty without due process of law as applied under *Estelle v. Gamble*, 429 U.S. 97 (1976).

### Count II – State Law Claims

Plaintiffs incorporate by reference Paragraphs 1 through  , as if more fully set forth herein.

For all named plaintiffs and class members housed at Garner Correctional Institution post-conviction, the practices, policies, acts and omissions alleged in this Complaint are in violation of Connecticut Constitution, Article First, Section _____in that they deprived them of their right to be free from cruel and unusual punishment.

For those class members housed at Garner Correctional Institution as pre-trial detainees, the practices, policies, acts and omissions alleged in this Complaint are in violation of Connecticut Constitution, Article First, Section _____in that they deprived them of their right to be free from deprivations of liberty without due process of law.

Although the installation of the radon mitigation system at Garner Correctional Institution completed on October 10, 2014 corrected the unconstitutional conditions of confinement, the harms suffered by post-conviction plaintiffs and post-conviction members of the plaintiff class from their exposure to such unconstitutional conditions of confinement prior to that date caused irreparable physical harm.

Although the installation of the radon mitigation system at Garner Correctional Institution that was completed on October 10, 2014 corrected the unconstitutional violations of due process, the harms suffered by pre-trial plaintiffs and pre-trial members of the plaintiff class

from their exposure to such unconstitutional conditions of confinement prior to that date caused irreparable physical harm.

By virtue of their deliberate indifference to the serious health risks associated with indoor radon exposure, including their intentional refusal to provide medical monitoring and management to those post-conviction plaintiffs and class members who have not yet exhibited a medical condition associated with radon exposure, Defendants Semple, Dzurenda and Falcone, all of whom had actual knowledge of the December 2013 and January 2014 test results revealing high levels of indoor radon gas, violated Connecticut Constitution, Article First.

By virtue of their deliberate indifference to the serious health risks associated with indoor radon exposure, including their intentional refusal to provide medical monitoring and management to those pre-trial plaintiffs and class members who have not yet exhibited a medical condition associated with radon exposure, Defendants Semple, Dzurenda and Falcone, all of whom had actual knowledge of the December 2013 and January 2014 test results revealing high levels of indoor radon gas, violated Connecticut Constitution, Article First  by deprivation of liberty without due process of law.

## Claims for Relief

Wherefore, plaintiffs request the following relief:

1. For the named plaintiffs and the members of the plaintiff class, a declaratory judgment that the acts and omissions of the Defendants violate the constitutional rights under both the U.S. and Connecticut Constitutions respectively as well as violate federal and state law;

34

2.      Notice to provide to all members of the plaintiff class, with the costs of such notice borne by the defendants;

3.      A comprehensive baseline medical examination of all class members – including either a chest X-ray or pulmonary CAT  Scan, the determination of which shall be made by a medical provider knowledgeable about radon toxicity and based on that class member's individual health history;

4.      Medical monitoring, including but not limited to periodic comprehensive physical examinations, and updated chest X-rays and/or a pulmonary CAT Scan, the determination of which shall be made by a medical provider knowledgeable about radon toxicity and based on that class member's individual health history;

5.      Follow-up health care treatment for all diagnosed medical conditions as have been previously identified, or may in the future be identified, with exposure to radon. At this time, those medical conditions include lung cancer and chronic, nonmalignant lung diseases such as chronic obstructive pulmonary disease (COPD), emphysema, chronic interstitial pneumonia, pulmonary fibrosis.

6.      Noneconomic monetary damages for all class members already diagnosed, or who in the future diagnosed with medical conditions as have been previously identified, or may in the future be identified, with exposure to radon. At this time, those medical conditions include lung cancer and chronic, nonmalignant lung diseases such as chronic obstructive pulmonary disease (COPD), emphysema, chronic interstitial pneumonia, pulmonary fibrosis. Additionally, damages for loss of wages and earning capacity, and punitive damages if permitted.

35

7.    Reasonable attorney's fees and costs;

8.    Such other relief as the Court may deem just and proper.

Undersigned swears to the truth of the aforementioned allegations under pains of perjury.

RESPECTFULLY SUBMITTED, this 26th day of August, 2016

Plaintiffs,

By _*michael stratton*_____
Michael Stratton
Stratton Trial, P.C.
Federal Bar # ct08166
117 River Street
Milford, Connecticut 06460
(203) 266-1300 (office)
(212) 987-5555 (cell)
Fax: (203) 757-9313
Email: mike@strattontrial.com

36